Everybody else has already settled in. When you are ready, you can begin. Good morning, Your Honors. Samantha Heifetz for the appellant. I think it's helpful, given the sequencing of the cases, to talk a little bit about how this case differs. Dugaboy was an equity owner, of course, the appellant here, had an ownership interest in the debtor, Highland. Now there weren't a huge number of ownership interests, and there weren't a large number that were bigger than Dugaboy's. Just two, in fact, I believe, that were larger than Dugaboy's. And when the debtor's reorganization plan was confirmed, it did what plans are expected to do. It extinguished the pre-petition rights of claimants and equity holders and assigned them the interest set out in the plan. In that respect, it did what you would expect to see. Now, what could have happened, also in line with what often happens in plans, the plan could have taken Dugaboy out of the money completely. It could have just extinguished his equity rights. I'm not saying that would have been appropriate, but it certainly happens, right? And given him nothing more, that's not what happened. That's not what the plan did. Instead, the plan recognized his Class A partnership interest and allowed him a contingent claimant trust interest, an interest in the claimant's trust as a member of Class 11, a holder of Class 11 interests. And so we have someone here who has a clear pecuniary connection, a clear pecuniary interest, and coming to the court below, debtor placed great emphasis on the idea that the percentage ownership was very small, that it was a small percentage. That can't be where the line is drawn to determine who gets to try to ensure that a settlement that affects their pecuniary interests is a fair and equitable one. The law requires the settlement to be fair and equitable. Your percentage interest of your clients is low. There's been an argument that it's very unlikely in the category of claimants in which you have been placed that you would ever be paid. What is the evidence here on that? When we're looking at speculative injury, I think it's probably, it's fair to say that the size of your injury is not what's significant, but I do think the likelihood of injury is significant. What do we know about that? That's absolutely right, Your Honor. Likelihood of injury is significant here, because we're talking about. What's the, oh, you said the likelihood is significant? Okay. Yes. Is that what you're, I couldn't. That's what I'm asking, and I didn't quite hear the word. I'm sorry, I thought you said it was, and I was agreeing. Yes, so we have a. I mean, see, isn't part of the argument by your friend on the other side, as well as the lower court, is that it's unlikely your client's going to receive anything because of their, the category of claimant they're in. I'm just wondering, what is the evidence to support that? Right. Well, so here we know that this estate has, even in the plan, projected a high level of repayment, of being able to satisfy interest under the plan, upwards of 75%, 77%, I believe. But what we've. 75% of the claims would be paid? Is that what you're saying? Yes, but what we have seen, there has been evidence in the record to suggest that, in fact, it will be 100%, that there is more than what was predicted. You know the record citation for that, for that 100%? Well, I think that there's a few things. We know in the record that there are assets, there's evidence in the record that there are particular assets that have been shown over time to be worth more than what was stated at the outset. There is a connection here, of course, between the parties, such that, for example, my client, many of the folks who have come with concerns about the bankruptcy proceedings, were intimately involved with the various interests at play. And so, they believe they put forward testimony about their understanding, Mr. Dondero, for example, about what he believes to be available in the estate. So I think there is reason here. The backdrop to this, of course, we should step back and appreciate. We're talking about a situation where one of the claims, one of the impaired rights, to use the language of Cajun Electric, as it was discussed earlier today, that's at issue here when it comes to the fair and equitableness of the settlement, is the placement of the interest in the HCLF. And the ways in which that limited transparency, so that the kind of information that we're talking about may not be available to the parties. Does anything in the record specify, does it give a number, how big is the claimant trust? I'm not aware if there is a specific number stated, and I would suggest that that would perhaps be best asked to the debtor, as they'd be best positioned. If the settlement is approved, do you get any money at all? Here's what we're talking about from a standing perspective. I think we want to be clear that the standard can't be, can the plaintiff, can the appellant, can the person coming forward in an adversarial proceeding or the person coming forward, do they have to show from the outset a likelihood of success? Is this a motion for a preliminary injunction? It's not. We don't have to meet that kind of a high bar and be able to offer the court evidence we couldn't possibly have. We don't control the state. In this instance, we may have access to some additional information. We may be better positioned than some other litigants would be. But when we're crafting, when the court is crafting a rule for parties in bankruptcy, the rule that is set out can't be one that imposes such a high standard at the outset that no one is able to bring a challenge to an unfair or inequitable settlement that does affect their pecuniary interests. And the amount of money that we're talking about here is significant. The settlement involves providing to the Harbor Vest, providing them with a total of $80 million, allowing them $80 million in claims that are, of course, senior to appellant here, to Duggaboy. So if those are illegitimate, $80 million more in the estate, that's a significant amount of money, and it can't be that because someone came forward and said your percentage ownership pre-petition was a small one. Well, first of all, small to who? These are all questions of what's small to you may be large to me. But there's no line drawing that can make sense on that vector. So then the question is, how much do we have to show? And I think there is good reason to think that we need to be careful about this court's precedence around the person agreed standard. Certainly, we are able to satisfy it here, but we want to recognize that standard can't suggest a level of proof for litigants that far exceeds anything they could possibly put forward. We need to- I've asked so far, and what I'm sort of hearing is there may not be an answer that you can give me. It's one thing to say it's some level of certainty, but you do need to be able to tell us that this settlement that you want to complain about has some likelihood, it's some modified, whatever modifier you want to put to that, reasonable likelihood something. At least, that's at least a starting point, it seems to me, that it will affect you in a pecuniary manner. And with respect for your advocacy skills, you seem to be trying to avoid saying there's anything in this record that would help us decide whether there is a way to quantify that likelihood. To the extent that I think it's difficult to say it with any certainty, I think that is where it becomes a burden that can't be imposed as a question of standing at this stage. So what we know is that the estate is proven to be worth a lot more than what they thought at the outset. And at the outset, they were already predicting a high level of being able to return to the various classes. There are a number of classes that were not impaired and have recovered 100%. Among the classes whose rights were impaired, then it's a question of what percentage of what they have been allowed will they recover. And so there is an expectation that we're going to be able to see, certainly I will tell you that the appellant anticipates that if this $80 million was not missing from the estate, not being paid out because of this settlement, that there would be enough money that class 11 would recover. And so, I mean, we're talking about a lot of money going to a settlement and the question here is whether Dugaboy gets to walk through the courthouse doors. We're not at, the court isn't ruling on the merits today. This isn't a question of whether or not we're undoing anything other than saying to the district court, hear the case. Let the parties put on their evidence. Allow there to be the kind of discovery that will fully answer these questions. You can proceed. You've answered to the extent you can, so please proceed. Well, I think it's really, I mean, I'm here to answer the court's questions. And so, I think the point is a simple one in many ways. This is not a case where we're talking about someone who's not an equity holder. We're not talking about a case where someone has an interest that's tangential to pecuniary interests. This is a direct pecuniary interest in, will the money that I expect to receive be there? Will the money that the plan entitles me to receive, if the conditions are satisfied, be there? And this is a waterfall. So if you insert people improperly above the appellant, his pecuniary interests are affected. If there's nothing further, I'll save that time for rebuttal. Thank you very much. Thank you. Again, good morning, your honors. Let us begin with, I think, the line of inquiry that the court was most interested in with the appellant. And that is whether this is all real or whether this is all speculative. I think that it's important for this court to appreciate a couple of rather simple propositions. The first is that our jurisprudence from this circuit and can lose standing if things happen after the beginning of the appeal. But one cannot gain standing if it didn't exist at the time of the appeal. That is a simple rule that has long been applied and has not been challenged this morning. Subsequent events are irrelevant unless they give rise to an argument that what was once valid standing is now no longer valid standing. But the opposite is not true. Subsequent events, especially when they don't appear in the record anywhere, which I will come back to in a moment. Is that what she was telling us? Is that why you're starting there? You think those are subsequent events since the appeal? I do, your honor. And in fact, let's talk about what the world looked like when this appeal began, okay? That's what I hoped to have been asking. But I guess you're telling me I wasn't asking that. Your honor, I think you were asking it, and I'm glad to answer the question in the way that we think is most appropriate to answer it. And that is, at the time this appeal happened, at the time this appeal began, there was an approved disclosure statement, which is basically like the prospectus that discusses what the plan of reorganization says, what it does, the impact on creditors. By the way, they're not a creditor. Anything that has to do with what the grand bargain that is being struck in the plan of reorganization is, that is described in sometimes exhaustive detail in the disclosure statement. But for our purposes this morning, what's most important about what the disclosure statement said was, we have our best guess right now, when the disclosure statement was approved, when creditors voted for the plan, they voted overwhelmingly for the plan. Almost unanimously for this plan. And again, they didn't vote, they weren't a creditor. The disclosure statement said, we believe that the value of this estate will be sufficient to return approximately $0.72 on the dollar for unsecured creditors. Now the unsecured creditors are in two different classes. There's regular general unsecured classes, that is class 8 under the plan. Then there is a second class of subordinated unsecured creditors, that is class 9. The disclosure statement did not believe, because they're subordinated, if class 8 is only getting $0.72, class 9 gets $0. Class 10 contains equity interests of an equity holder that is superior to this appellant. That is class 10. The disclosure statement also said that entity gets $0. And needless to say, class 11, which this appellant is part of, class 11 also gets $0. So at the time this appeal began, what we knew, as best as we could know it, and what was part of the ruling of the bankruptcy court confirming this plan, which incidentally the confirmation order has been affirmed by this court, as I think this court knows, dug a boy, this entity was completely out of the money. Now, what may have happened later, and counsel for the appellant said something that I think was really troubling to hear. I don't know if it was intentional, I don't believe it was, when she said, it has proven to be true that there is more money in the estate than we thought at the beginning of the appeal. A few things about that. As we've said before, there is nothing in the record before this court that indicates any of that to be true. Two, even if there were, has proven is simply an inaccurate way of describing reality. It has not been proven. There have been allegations, I don't mind telling this court, there have been recent allegations that this estate has had greater success liquidating assets than it expected to have when the disclosure statement was written a couple of years ago. And yes, there is a general expectation that creditors will get a greater recovery than the disclosure statement required. But here's what has to happen before any money ever gets to Dugaboy. And there's a lot of things that have to happen. The first thing that has to happen is that all the expenses of the claimant trust, all of them, have to be paid in full. Now, these expenses don't only include legal fees, which, as this court can probably appreciate, legal fees have continued to be incurred, sometimes in a very rapid way, because our wonderful trips to New Orleans seem to happen pretty frequently. There's a lot of appeals. So even just from the appellate standpoint, legal fees continue to be incurred at an unfortunate pace, I should say, in this case. But those expenses that have to get paid first, before anything else gets paid, even the claims of creditors from the claimant trust, includes indemnification expenses. Now, the claimant trust has an obligation to indemnify the trustees, the people that work for the trustees. That was the subject, by the way, of another appeal in this court a few months ago. And that appeal was also affirmed the bankruptcy court's order approving the indemnity subtrust that was created in connection with the confirmation of the plan. And one of the things that this court did a few months ago, back in January, when it affirmed that indemnity trust, was two things. A, recognized in footnote seven of that opinion, which is a published opinion, it recognized that expenses of the claimant trust have a superior claim to recovery before anyone else, including creditors from the claimant trust. So the court recognized that reality. The second thing it recognized, of course, was that this appellant, Dugaboy, lacks standing. That issue affirmed the dismissal of Dugaboy from that appeal for lack of standing. And not to be outdone, Your Honor, Judge Higginbotham sat on a different panel just a few weeks ago and again dismissed this exact appellant from another appeal. That one had to do with compliance with Bankruptcy Rule 2015.3, which is a highly technical requirement that would have required Highland to give over to Dugaboy information that Dugaboy already had. And the bankruptcy court said that's ridiculous, you don't need to do that, that's a technical requirement you don't need. And Judge Higginbotham's panel in a per curiam decision from just a few weeks ago said Dugaboy does not have standing. And we were told by that panel why. It's because, to quote that panel, several events would have to occur before money is put back into Dugaboy's pocket. Here are those several events. We've spoken of the first one, which is all of the expenses of the claimant trust have to be paid in full. And right now we have no idea how high those expenses can go. They have already gone way higher than we ever would have imagined, almost entirely because of the Dondero entity's unrestrained litigiousness, which continues to this day. So indemnification expenses and legal fees, which is really, they are soaring ever higher because of these parties. All those have to be paid in full. That's the first thing. The second thing that needs to happen is that all creditors of the estate, all of those creditors have to be paid in full. And we talked about the waterfall of how that works. Class 8 has to be paid in full, and only then can Class 9, the subordinated general unsecured claims, then they all have to be paid in full. And then only after all that happens, then the equity holder in Class 10 needs to be paid in full. And only then, after all of that happens, if there's any money left, could there be a recovery for Dugaboy on account of its 0.1866% equity interest that it had in the debtor? There's no question Dugaboy's interest is very... Attenuated. Attenuated, subordinated, whatever. And there's no guarantee it's going to get a red cent at the end of the day. But just because there's no guarantee, does no guarantee automatically equate with speculation or conjecture? I mean, isn't every junior or subordinated creditor, isn't every interest they have speculative in that context in a bankruptcy? Of course it is. And it is, I think Your Honour can appreciate this of all people, when Your Honour wrote the decision in Technicool, you were very clear about pointing that out. The facts in the Technicool case were really remarkably similar to what we're talking about right this moment, which was you had this gentleman who was a former equity holder of the debtor and had a contingent right to receive some sort of recovery on account of his equity interest. But of course it was just as speculative, it was just as uncertain as what we're talking about today. Probably less so, frankly. I think what we're dealing with today is greatly more speculative and much more attenuated than Mr. Furlow, who I think was his name. Making the comparison point that I think my colleague was asking, and I had this question earlier, just when, what kind of certainty was, or exchanged to some extent, with your friend on the other side, okay, no certainty, no absolute, for a while you're saying it seems to me there's absolutely no way Dugovoy could receive anything from here, but maybe on appeal some things have changed, but we shouldn't consider them. Is there anything we can get from our party-agreed jurisprudence on just what speculative means, not as a number, percentage of likelihood, but what are we looking for? I think in a rather summary case, and I respectfully don't think that your question is an invitation for us to take several dives into several different rabbit holes about all the facts of more than a dozen cases that this court has had on person aggrieved. It's very clear here, so don't worry about it, I think is what I'm hearing from you. Well, no, I have a better answer than that. Your Honour, if I may, and that is that the takeaway from all of those, more than a dozen decisions of this court over the years on the person aggrieved standard, the takeaway is, of course, there is no such thing as some sort of philosophical certitude in the universe. We don't know for certain that the sun will rise tomorrow morning. However, we take a general view that that is about as certain as we need to know. On the other end of the spectrum, it is extremely unlikely and nearly inconceivable that the sun will not rise tomorrow morning. And now we have a spectrum that is defined by those two extremes. And before, you know, without getting extremely philosophical about all of this, the jurisprudence that we get from this court is that when we look at what is likely to happen, given the circumstances of the case, given the operative documents, particularly in bankruptcy cases, and given the rights of the parties that are before the court, what is most likely to happen? And what Judge Higginbotham's panel did was it didn't even really ask or answer the question in that way. What it said was, let's just see what has to happen before I even get to pay attention to this party, because they will have some sort of financial stake. And so many things have to happen that even if I assume that, let's say, six of the seven things happen, which, by the way, there's no evidence in the record that would lead me to believe it's more likely than not that they all would happen, if I can't just get down the chain of the what-ifs without making assumption after assumption after assumption based on a dearth of evidence in the record that that could ever happen, then at some point we say it is simply too speculative. And, yes, is it a little bit of sticking your thumb in the air and testing the wind? It is a little bit of that, but not a lot, because what it's really a lot of... Councillor, you know, a collier on bankruptcy, which is, if federals like me have to turn to, not having practice in the bankruptcy field, says in a rather unqualified way, creditors may appeal from orders disposing of property of the estate. Why? Because such orders affect the race to which creditors look for for payment of claims. It's sort of an open and qualified... ..treating the matter as one of a category. If you have the race, you have the claimants of the first... And that would... If you take that on its face, it doesn't accept the speculation as an answer. Well, Your Honour, respectfully, I agree, but I would also say if you take that statement on its face, then we're talking about the category of entities that the Bankruptcy Code is all about, and that is creditors. That is people to whom money is owed. Duggarboy, uncontroversially, uncontestedly, is not a creditor. It is not a creditor. It is literally the last part... I'm trying to get a... We move away from... ..in response to the questions with regard to speculation, which I think are out-questioned. I want to go to one that gives us a base, an absolute unqualified statement, and see...and put those aside. And I think that's... I think you've answered that. I don't know if that makes sense, but... I'm sorry. Respectfully, Your Honour, I think you trailed off at the end and I couldn't tell whether there was a question for me. Forgive me. My voice drops. I can't help that. I would direct your attention to this unqualified statement there because of... And really ask your questions about whether that really is a baseline from which we start. One way you could read that is that... ..when you really do have a... ..you're dealing with creditors. And, of course, that kind of begs the question here. If the basic question is, we're dealing with a system that is designed to address the needs of some sort of party that is disproportionately affected by financial distress and bankruptcy, which goes back to the founding of our nation. There's a bankruptcy clause in our Constitution. We've been thinking about this stuff for 250 years. But what we talk about are the rights of people to whom the debtor owes money, not the person who started the debtor, not the person who used to own a tiny piece of the debtor. They are, and always have been, under the Bankruptcy Code, under any congressional system we have, whether it's the Bankruptcy Code, which was enacted by Congress in 1978, or the Bankruptcy Act of 1897, I think it is. I definitely got that wrong. I'm sorry. And any bankruptcy legislation that we've had in this country since the founding of our nation has always put the needs of former equity holders in the debtor, all the way down at the bottom. You said, I think I heard you say about two minutes ago, that Doug Abboy is not a creditor. Did you say that? I did say that. So I get that their interest is attenuated, subordinated, but you say they're not a creditor in any manner, way, shape, or form. That is correct. There is nothing in the record that demonstrates that they are a creditor, and frankly, they don't claim to be a creditor. And I think that that's an important distinction, Your Honor, because, again, what we talk about when we're thinking philosophically about what it is that all of us are trying to achieve when we participate in a system that is designed to resolve the disputes between debtor and creditor, when we're trying to have a system that has become, by the way, the model for the rest of the Western world. In our system, we are trying to walk this fine line between giving the best possible recovery we can get to creditors, to people to whom debt is owed, a fair recovery, while also doing the nearly impossible, which is to preserve businesses, preserve jobs. It is precisely why the owners of the debtor are so far down in the pecking order as they are, because the needs of our economy in terms of having operating businesses, in terms of having people not lose their job because of unfortunate financial events that befall their employer, and to not impose externalities and costs on people who are fairly and truly owed money on a debt, to not have them bear all of the damage of financial distress. That's what we do in the bankruptcy world. That is what the United States Bankruptcy Code is all about. It isn't about upholding the rather emotional distress that is felt by jilted former equity holders about something that, whether it happened or didn't happen, simply cannot affect them financially. That is what the person who agrees standard really asks that question, no matter how it's expressed. Frankly, even if we talk about Lexmark, and I know Council didn't bring up Lexmark in her argument, but even if we think about what Lexmark was talking about, which is the zone of interest, a former equity holder who has a very inconceivable right to a recovery is not within the zone of interest of the Bankruptcy Code. The Bankruptcy Code is about helping people who are owed a debt get a recovery on that debt. Thank you, Your Honors. Good to be eager. If I may, Your Honors. There's a lot to respond to, but at least three points that I want to make sure I hit. It's sort of an extraordinary argument to listen to because it's clear, it underscores the ways in which the debtor is really trying to rewrite the Bankruptcy Code. Let's step back and be very clear. Doug Aboy was an equity holder, but the Bankruptcy Code, whatever my friend on the other side thinks about it, it certainly recognizes the rights of equity holders. If you look at, again, this is a case about standing, so when we talk about who the Bankruptcy Code, who Congress anticipated would be able to bring challenges just like this one, you don't need to look very far. 1109B expressly mentions equity holders. It's in the text of 1109B. The zone of interest, it's explicit. We don't need to think about what we can extrapolate. We know for a fact. Then we layer on top of that the fact that here the reorganization plan did not exclude Doug Aboy. It could have disallowed entirely any interest for him whatsoever. It didn't do that. It placed him in class 11. It recognized that that's an impaired interest, so he was given a vote. So there were three classes that voted for the plan, and there were three classes that voted against the plan. It will not surprise you that Mr. Doug Aboy or Doug Aboy, Mr. D'Andaro, Doug Aboy investment voted against the plan. That should come as no surprise. But 27 and 9, those classes accepted. 8, 10, 11 rejected. Zone of interest. I mean, we are so clearly within the zone of interest, we're recognized in the statute. Now let's just, the second thing I want to hit is just to recognize what is going on here and what's so extraordinary. If we had accepted your argument, what would happen? Well, I mean, here the point is for us to be able to go back to district court and argue the merits of this case. And that's the point I wanted to make. And I apologize for the use of the word proven earlier, but as you heard from opposing counsel, what has come to light. Yes. You would go back to the district court and argue what? You said the merits of the case. Challenging the settlement, because this is the point. What we're here on, the underlying issues are challenges to this settlement that took $80 million and promised it to other people. We think without any basis, improperly, inequitably, contrary to the bankruptcy system's requirement that the settlement be approved on the grounds that it would be fair and equitable to all. So here, what we have, just to recap, we have a debtor who's perhaps not forthcoming at the outset about what's going to be available to people, makes predictions that understate the value of the estate. Those who are affected aren't able to show, perhaps as clearly as they would like to, that they will receive, but there's good reason to believe they will, and certainly we're not required to prove our case before we've even gotten through the courthouse doors. So we show that, look, if this $80 million is there, we've got a real shot. And they say, no, no, no, that's not good enough. Later they concede, oh, maybe now some things have, they're not proven, I apologize for that, but come to light. There are some things that appear to be different than at the outset. Still you lose. I mean, that's pretty extraordinary that so much of the argument then also adds that, by the way, it's because of legal fees, as if to hold us responsible for the fact that we are having to fight for our right to get into the courthouse. Did you hit your third point? The third point is just to distinguish some of these other cases. The recent dismissal that the panel that Judge Higamotham was on, that was not this kind of direct pecuniary interest. We were talking about a settlement worth money and whether that money should be in the estate or not. That was about reporting, and the panel said, look, after the fact, you're talking about getting reports from retrospective accounting reports. It's not going to tell you anything, and so what's the point? That's a very different case than this one. Technical is also a very different case. In technical, as Your Honor knows, I mean, the question was about the appointment of a special counsel, and given the special counsel's dual relationships, whether the special counsel might approach things in a way that it's a very different case. Here, this is about money. This is about a former equity holder who has been allowed interest, a contingent claim on the trust that's worth money, and the question is, is there going to be enough money in the pot so that... Quick question about labels, nomenclature. Opposing counsel says you're not a creditor. You say you're an equity holder. Right, right. There's no dispute here. On this point, opposing counsel and I agree entirely. The point here is that Duggaboy, the investment fund, was a pre-petition owner. It had an ownership interest, limited partnership interest, if you want to be really specific, in the debtor, Highland, and when the debtor's reorganization plan was confirmed, that was transformed. Right? The way that you work, you extinguish that right, and here we were given a new interest, and that new interest was recognition of a Class A partnership interest that aligns, as you heard, with a claimant trust interest that kicks in as soon as everyone else gets their money. So it is true. We're at the end of the line, but for the line to have any meaning, there has to be at least an opportunity to show that even the person at the end of the line ought to be collecting. To do what they're saying. Yes, Your Honor. You are committed to your case. You briefed it well and argued it well, but your time is up. Thank you, Your Honors. Thanks to both sides for helping us understand this case.